522 A.2d 683

Henry Atterberry, Gladys Atterberry, Charles Orr and Blanche Orr, Appellants v. Leo Smith and George Hopkins, Appellees.

Argued November 20, 1986, before Judges CRAIG, DOYLE and COLINS, sitting as a panel of three.

*Victor A. Neubaum, Malone & Neubaum,* for appellants.

*Garnita M. Selby,* for appellees.

OPINION BY JUDGE DOYLE, March 12, 1987:

This is an appeal by Henry Atterberry, Gladys Atterberry, Charles Orr, and Blanche Orr (Appellants or Defendants) from an order of the Court of Common Pleas of York County which entered a final decree affirming a decree nisi filed on March 26, 1984 and a modification of the decree nisi filed on April 19, 1984.

The instant litigation arises from a dispute among various members of The Church of the Living God, 341

Wheatfield Street, York, Pennsylvania (local church). That church is alleged, in a complaint in equity seeking a preliminary and permanent injunction and filed by Leo Smith and George Hopkins (Appellees or Plaintiffs), to be a constituent local church of The House of God which is The Church of the Living God the Pillar and Ground of Truth, Inc. (national church). This hierarchical characterization is vehemently disputed by Appellants, the Defendants below.[1] Plaintiffs further allege that the local church is governed by the *Church Discipline,* a document containing, *inter alia,* doctrinal statements and the general organizational pattern of the denomination. The contention that this document is binding upon the local church is another matter hotly disputed by the parties. Plaintiffs also allege in their complaint that they were appointed to various church offices by Reverend Carl Whyte who they assert is the pastor of the local church. They further assert that Defendants were removed from their church offices by Reverend Whyte. Plaintiffs maintain that Reverend Whyte's appointment and removal power emanates from, and is in accordance with, the *Church Discipline.*

In their complaint Plaintiffs sought from the trial court an order enjoining Defendants from (1) engaging in the unauthorized collection of tithes and offerings from worshippers during church services, (2) interfer-

---

[1] The instant dispute, which generally involves warring factions of church trustees has its roots in a dispute within the church which occurred upon the death of the founder of the House of God denomination, Bishop A. H. White and the resultant attempt to establish his successor. Bishop White had appointed his son, Raymond White to be his successor, but members of the Board of Bishops disputed Bishop Raymond White's authority and elected Bishop J. H. Smith as the new President General. For a detailed relation of this history *see Board of Bishops of the Church of the Living God v. Milner,* 99 Pa. Commonwealth Ct. 612, 513 A.2d 1131 (1986).

ing with the newly appointed trustee, treasurer, deacon and secretary so as to prevent them from performing the duties of their offices, (3) disrupting, interfering with or harassing Reverend Carl Whyte during the delivery of his sermons, (4) engaging in a campaign among church members to undermine Reverend Whyte's authority and (5) interfering with Reverend Whyte's performance of his sacerdotal duties. Relief sought by Plaintiffs further included an accounting and return of all monies collected during worship services since November 6, 1983 to the newly appointed treasurer and an order directing the former treasurer to execute the proper bank documents so as to make available immediately church funds to the newly appointed officers thus enabling them to carry out their official responsibilities.

Defendants in their answer admitted that Plaintiffs were serving as church officers, but denied that they occupied these positions by virtue of any authority from Reverend Whyte or the *Church Discipline*. They further denied that Henry Atterberry, Gladys Atterberry and Charles Orr were *former* church officers, instead asserting that they *remain* officers. They admitted that Blanche Orr was a former officer. Defendants also denied that Reverend Whyte continues to serve as the pastor of the local church and denied in any event the power of the local pastor to remove trustees, instead asserting that trustees serve at the will of the majority of the church members. Finally, they denied engaging in the disruptive behavior alleged in the complaint.

A hearing was conducted by the trial court on December 29, 1983, subsequent to which it issued its adjudication and decree nisi. That decree determined that the local church was part of a hierarchical structure, that Plaintiffs were validly appointed to their church offices by Reverend Whyte, and that he had validly removed Defendants from their offices. In reaching these

determinations the trial court relied upon numerous passages of the *Church Discipline*.

The request for an accounting was denied because the trial court determined that individuals who contributed offerings "did so voluntarily and with full knowledge that a parallel group of church officers was also collecting tithes and offerings at the same time." The trial court further indicated that it was satisfied that the monies collected would be used to benefit the church congregation. The court thus declined to order that the offerings be given to a particular individual. Finally, while the trial court did not specifically determine whether Reverend Whyte continued to hold his position as pastor of the local church, the inference drawn from the adjudication is that he did inasmuch as it upheld his appointment and removal power which presumably was premised upon his position as pastor.

In April, 1984 the trial court modified its decree after being advised that subsequent to the issuance of its decree nisi church services were unable to be held. It thus directed that Defendants not interfere with or prevent services held at the local church but specifically permitted Defendants to attend and participate in the services "in the same manner and to the fullest degree enjoyed by any other members of the church." By order of July 2, 1985 the decree nisi and its modification became final.

Defendants now argue to this Court that Reverend Whyte had no authority to act unilaterally to appoint or remove church officers, that the denomination is not hierarchical in nature, and that the local congregation is not bound by the *Church Discipline,* and assert that the trial court erred in finding to the contrary. It is thus our task to determine whether the court below committed legal error.

In setting forth the law to be employed where the issue to be settled is a dispute involving a church our

State Supreme Court has recently explained that a threshold determination must be made as to whether the dispute is one which is doctrinal in nature or instead involves only questions of civil law. *Presbytery of Beaver-Butler of the United Presbyterian Church v. Middlesex Presbyterian Church,* 507 Pa. 255, 489 A.2d 1317, *cert. denied,* 474 U.S. 887, 106 S.Ct. 198 (1985). The *Middlesex* Court recognized that where the dispute involves principles of civil law, such as ownership of property, it can be solved "without intruding into the sacred precincts" by employing neutral principles of law. *Id.* at 262, 489 A.2d at 1320-21. Where, however, the resolution of the issue involves questions of discipline, faith, ecclesiastical rule, custom, or law, a civil court must defer to the highest church judicatory to which the question has been carried. *Id.* at 259, 489 A.2d at 1319 (citing *Watson v. Jones,* 80 U.S. (13 Wall.) 679 (1872). *See also Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 713 (1976) (adding to the list of areas foreclosed from civil court intrusion a church's "internal organization"). The wisdom of this "deference rule" as it came to be known was recognized by the *Middlesex* Court when it wrote:

> [T]he right to practice one's belief and worship as one chooses is so deep a root of our constitutional culture that a court, even one with the best intentions, can be no more than a clumsy intruder into the most delicate and sensitive areas of human life. When Caesar enters the Temple to decide what the Temple believes, he can leave behind only his own views. The view of a court as to who are heretics among warring sects is worth nothing, and must count as nothing if our cherished diversity of religious views is to prevail.

*Id.* at 260, 489 A.2d at 1320.

As instructed by *Middlesex,* our initial task must be to determine whether the instant dispute is doctrinal or civil in nature. Although the trial court was not asked to decide a pure question of belief or faith, neither was the question one concerning a matter which is totally civil in nature, such as the ownership of property. Instead the issue seems to fall somewhere between the two categories enunciated in *Middlesex.* Resolution of the ultimate question calls not only for an examination of the form of church government, but also for a determination of whether Reverend Whyte is in fact the local pastor and what, if any, powers the local pastor has with respect to appointment and removal of church officers. In our view these latter questions in particular are more akin to doctrinal questions than to civil ones. Our determination that the instant dispute is primarily doctrinal is based upon *Watson* as well as one of its more recent progeny, *Jones v. Wolf,* 443 U.S. 595 (1979), both of which indicate that matters of church polity are best left to ecclesiastical tribunals.

Having made the preliminary determination that the substantive dispute is doctrinal, it follows that the proper law to be applied is the deference rule, which, as previously indicated, requires that the highest judicatory of the church determine the substantive issues. We note that there has not yet been an "adjudication" by any church body on the propriety of the appointments and removals or on the question of whether Reverend Whyte is the local pastor. Under ordinary circumstances we would thus order that the case be dismissed and the matter resolved before the appropriate ecclesiastical tribunal. But this case contains a further complication; there is no agreement between the parties as to what body is the highest judicatory inasmuch as Defendants contend that the denomination is congregational whereas Plaintiffs assert that it is hierarchical. Until this

matter is resolved the question of who has jurisdiction to decide the substantive issue cannot be answered. Thus, the next inquiry must be whether a civil court has jurisdiction to decide what body is the highest judicatory before which the substantive issue should be properly brought.

Our research has disclosed that a similar problem arose in *Pilgrim Holiness Church v. Pilgrim Holiness Church of Athens Township,* 436 Pa. 239, 259 A.2d 870 (1969), a case which involved a property dispute. While under the holding of *Middlesex* a property dispute case would not require inquiry into the governmental structure of the church because neutral principles of law would be applied, *Pilgrim Holiness Church* predated *Middlesex* and under prior caselaw where the dispute was one involving church property the law was that in cases involving a hierarchical form of church government the property belonged to the parent church. *See e.g. Pilgrim Holiness Church* and cases cited therein. Thus, under these older property dispute cases a determination as to whether a church was hierarchical was relevant, even crucial. In *Pilgrim Holiness Church* the case came before the trial court on a motion for judgment on the pleadings. Judgment was granted in favor of the parent church and appeal followed. Our State Supreme Court noted that the pleadings did not clearly establish whether the church was hierarchically governed. Accordingly, it vacated the lower court's order and *remanded the case for further proceedings.* Thus, *Pilgrim Holiness Church* teaches that where there is a dispute as to whether a church is hierarchical or congregational in nature it is the function of the *civil court* to resolve that factual matter. Further support for this position appears in the form of statements made by Justice WHITE in his concurring opinion in *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. at 725

(1976) (WHITE, J., concurring). *But see Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 368-70 (1970) (BRENNAN, J., concurring) (where the identity of the governing body that exercises general authority within a church is in dispute civil courts should not inquire into religious law necessary to resolve controversy and *Watson* rule should not be employed).

As noted earlier the trial court in the present case did make a factual determination and found that the church was hierarchical in character. In so doing it relied upon various portions of the *Church Discipline.*[2] We hold that the trial court's finding is supported by the evidence and that in making its finding it did not intrude into impermissible areas of a doctrinal nature. We thus affirm that portion of its order which held that the denomination is a hierarchical one.

Although the trial court did determine that the denomination in question is hierarchical, it did not identify the highest judicatory within the relevant body; hence we must remand so that it may do so. And under *Middlesex* it is this tribunal and not the trial court which must decide the substantive question in issue. Therefore, we must vacate that part of the trial court's order which attempted to decide these questions by holding that the appointments and removals were valid.

---

[2] It is clear that in church cases involving neutral principles, such as property disputes, a civil court may scrutinize religious documents provided it does so "in purely secular terms." *Jones v. Wolf,* 443 U.S. 595, 604 (1979). Although the ultimate issue in this case requires application of the deference rule, not the neutral principles approach, we do not believe that the trial court here was precluded from considering in secular terms religious documents for the purpose of determining the preliminary jurisdictional question of whether the church's structure was hierarchical or congregational.

Defendants assert that the trial court in having made its initial determination that the church was hierarchical in nature violated what is in essence the principle of collateral estoppel. They maintain that the question of whether this denomination is hierarchical was previously resolved in the negative by an opinion of the Court of Common Pleas of Philadelphia County. *See Milner v. Board of Bishops of the Church of the Living God Inc.,* No. 4405 November Term 1981 filed May 5, 1983. That lower court opinion did indeed hold that the church was congregational in nature. But the case was one involving a property dispute. It was appealed and decided by this Court *subsequent* to the Supreme Court's decision in *Middlesex. See Board of Bishops of the Church of the Living God v. Milner,* 99 Pa. Commonwealth Ct. 612, 513 A.2d 1131 (1986). While we affirmed the order of the Philadelphia common pleas court, we did not affirm its rationale. Specifically, we did not affirm the court's finding that the church was hierarchical because such a finding was legally irrelevant under *Middlesex.* The principle of collateral estoppel applies only where facts actually litigated were *essential to the judgment and material to the adjudication. McCarthy v. Township of McCandless,* 7 Pa. Commonwealth Ct. 611, 619, 300 A.2d 815, 820-21 (1973). Factual findings which are legally irrelevant do not meet these criteria. Accordingly, we reject the notion that the issue of whether the denomination is hierarchical has been foreclosed by the principle of collateral estoppel.

We add finally, although this matter is not pressed on appeal, that the trial court was completely within its equity power in enjoining Defendants from disrupting or harassing other church members. We note in addition, that its order in this respect was well tailored so as to allow both factions to attend and participate in

church services. We also note that the trial court in its findings determined, *inter alia,* that at least one individual had attempted to commit an intentional tort upon Reverend Whyte in the church building during the course of a religious service. While we can understand that emotions run high in cases such as this, we would remind the parties that tribunals, both civil and ecclesiastical, exist for the purpose of dealing with disputes such as those in the present case and should be utilized. The trial court is well within its authority to continue to use its equity powers to maintain order should such measures be necessary. *See e.g., Trinity Evangelical Lutheran Church of Clairton, Inc. v. May,* 98 Pa. Commonwealth Ct. 112, 510 A.2d 914 (1986).

Based upon the foregoing discussion, the order of the trial court is affirmed in part and vacated in part and the case is remanded for further proceedings consistent with this opinion.

ORDER

Now, March 12, 1987, the order of the Court of Common Pleas of York County in the above-captioned matter is vacated insofar as it determined that the appointments and removals of church officers were valid. It is affirmed insofar as it determined that the denomination was hierarchical and insofar as it enjoined certain church members from engaging in disruptive and harassing behavior. The case is remanded to the trial court with directions that it identify the highest judicatory body which is empowered to decide the substantive issue.

Jurisdiction relinquished.