# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

St. Mary's Knanaya Church, Inc.,     :
Reverend Father Chacko Punnoose,     :
Reji Philip, Jake Puthiamadathil,     :
Kuriakose M. Abraham, Renny     :
Eranackal, Tony Alummootil, and     :
Cherian Mathew     :
    :
            v.     :    No. 1782 C.D. 2016
    :    Argued: October 17, 2017
Father E.M. Unnikunju Abraham,     :
Joby Joseph, Stephen Mathew, John     :
Mathew, Thampi Pothen, Kutty     :
Kurien, Kenny Pothen, Tobin     :
Thomas, Abraham Cherian, and     :
North American Knanaya     :
Diocese, Inc.,     :
            Appellants     :


BEFORE:     **HONORABLE RENÉE COHN JUBELIRER,** Judge
                  **HONORABLE ROBERT SIMPSON,** Judge (P)
                  **HONORABLE JAMES GARDNER COLINS,** Senior Judge


<u>OPINION NOT REPORTED</u>


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**             **FILED: November 16, 2017**

This case involves the latest in ongoing litigation between two competing factions of St. Mary's Knanaya Church, Inc., and, more specifically, which faction lawfully owns church property located at 701 Byberry Road, Philadelphia. One faction is led by Father E.M. Unnikunju Abraham (Abraham Faction), the members

of which are the appellants in this matter. The other is led by Reverend Father Chacko Punnoose (Chacko Faction), the members of which are the appellees. Both contend they are the "true church" and, therefore, owners of the church property.

The present appeal is from an October 5, 2016 Order of the Court of Common Pleas of Philadelphia County (trial court), which, *inter alia*, ordered the Abraham Faction and the Chacko Faction to maintain the status quo, that is, sharing use of church property during the pendency of the litigation between the two factions. Specifically, the Order required the parties to share possession of the church property on alternating weeks from Wednesday to Wednesday and to share possession on Sundays, with the Abraham Faction having access from 7:30 a.m. to 10:30 a.m. and the Chacko Faction from 11:30 a.m. to 2:30 p.m. In addition, the parties were to "give 24 hours['] notice to access the property on non-possessory days for recognized religious observances such as funerals[] [and] religious holidays[.]"[1] (Trial Ct. Order, Oct. 5, 2016, at 2.) The Order was entered following a hearing on a request for a preliminary injunction[2] filed by the Chacko Faction, who alleged it had been locked out of the property despite sharing use of the church for the prior

---

[1] In the Order, the trial court also found the Abraham Faction violated a September 21, 2016 Order by failing to remove chained locks from the property and failing to place its deed into escrow and violated a February 27, 2014 Order by preventing access to the property. It ordered the Abraham Faction to pay $2,500 for the Chacko Faction's counsel fees; ordered the deed to be placed in escrow, as was previously ordered, and that it not be transferred or encumbered in any manner; and prohibited each party from representing that it is the rightful owner of the property given the ongoing litigation. (Trial Ct. Order, Oct. 5, 2016, at 1.)

[2] The request for a preliminary injunction was filed one day after the Chacko Faction initiated the underlying matter by filing an eight-count complaint seeking, *inter alia*, to undo certain corporate filings it maintains are fraudulent and to void sale of the church property on similar grounds.

two years under the terms of a 2014 Consent Order.[3]  At the hearing, after one witness testified, the trial court advised the parties it would accept additional evidence via affidavit or deposition and, in the meantime, was issuing what it called a "stay," which was memorialized in the Order in dispute.[4]

Instead of submitting additional evidence, the Abraham Faction filed the instant appeal, raising three issues:[5]

1. Whether "a civil court has subject matter jurisdiction to enter a . . . preliminary injunction imposing a worship schedule [on] two factions of a hierarchical church engaged in a dispute over religious doctrine and church governance[;]"

2. Whether "the trial court abused its discretion in granting [the] . . . preliminary injunction after a partial hearing in which only one witness from one side was permitted to testify[;]" and

3. Whether "the trial court commit[ed] an error of law by granting [the] . . . preliminary injunction without requiring the Chacko Faction to post a bond pursuant to [Rule 1531(b) of the Pennsylvania Rules of Civil Procedure,] Pa. [R.C.P. No.] 1531(b)?"

---

[3] The 2014 Consent Order provided the Abraham Faction with a key to the premises and access to the church property for the expressed purpose of worshipping on Sundays from 7:30 a.m. to 10:30 a.m. and the Chacko Faction was "permitted to worship" between 11 a.m. and 2 p.m. on Sundays.

[4] At the hearing, the trial court stated:

While I am holding this under advisement, I have indicated that I am putting a stay on the proceedings, which in some respects, a stay can sound very much like an injunction.  But there was more in the [Chacko Faction's] injunctive request than just I am going to say stays.

(Reproduced Record (R.R.) at 1202a.)  As the trial court stated in its Opinion, it "formally dispose[d]" of the preliminary injunction request on February 17, 2017, when it ordered the October 5, 2016 Order to remain in effect.  (Trial Ct. Op., Mar. 30, 2017, at 4.)

[5] The Abraham Faction does not challenge the trial court's Order as it relates to violation of prior court orders, an award of counsel fees, or placement of the deed and monies associated therewith in escrow pending disposition.

(Abraham Faction Br. at 7-8 (emphasis omitted).)

Before we reach the merits of the arguments, we briefly summarize the background behind this dispute. As mentioned above, at the center of this dispute are two warring factions of St. Mary's Knanaya Church, each claiming to be the "true church" and, therefore, owner of the church property. St. Mary's incorporated in 1991 for the following purpose:

> To worship, conduct religious services and functions, to arrange for, administer sacraments and conduct observances under the jurisdiction of the North American Knanaya Diocese, which is part of the Malankara Syrian Knanaya Community affiliated to the Syrian Orthodox Patriarchate of Antioch and all the East, and which is governed according to the Malankara Syrian Knanaya Community Constitution.

(Reproduced Record (R.R.) at 649a.)

The factions agree that, at the head of the church, is the Patriarch and beneath him are four regional units each headed by a metropolitan. The Abraham Faction maintains it is the Metropolitan Silvanos Ayub who governs the American, Canadian, and European regional unit after he was appointed by the Patriarch in 2009. (R.R. at 738a-39a.) The Chacko Faction maintains Chief Metropolitan Severios Kuriakose of India controls. (Compl. ¶ 13.)

It is this divide that is the root of this litigation. If Metropolitan Silvanos Ayub is the proper metropolitan, he appointed Father Abraham as vicar of St. Mary's. (R.R. at 757a.) The Chacko Faction maintains he was without authority to do so, and instead, the Chief Metropolitan's appointee, Father Chacko, is the proper vicar. (Compl. ¶¶ 2, 14.)

According to the Abraham Faction, the Patriarch has reaffirmed the authority of Metropolitan Silvanos Ayub in 2011 and 2014. (R.R. at 748a-50a, 803a-04a.)

The Patriarch also purportedly ruled that only the appointed vicar or assistant vicar may render sacerdotal services in any Knanaya parish or congregation and that the sacrament of the Holy Eucharist shall be performed only once on Sundays. (R.R. at 746a, 811a-12a.)

A number of legal actions have arisen since this feud began. In February 2014, the Abraham Faction filed suit to void what it alleged were bogus corporate documents filed by the Chacko Faction and to regain access to the church property after it was allegedly locked out. The parties[6] ultimately agreed to entry of a Consent Order that allowed both parties access to the church property on Sundays. (R.R. at 92a.) After entry of the Consent Order, the Chacko Faction filed preliminary objections to the complaint, and the Abraham Faction, while the preliminary objections were still pending, voluntarily discontinued the action without prejudice. (Abraham Faction Br. at 10.)

A few months later, another action was filed against the Chacko Faction, this time by North American Knanaya Diocese, Inc. (NAKDI), the regional unit, which requested a declaration to enforce Metropolitan Silvanos's hierarchical authority. (R.R. at 280a-81a.) The Chacko Faction filed preliminary objections on the basis of the deference rule, which were granted. (R.R. at 274a-86a, 790a-91a.)

In June 2016, the Abraham Faction filed amendments to the corporate documents, in what it called an effort to undo the bogus filings of the Chacko Faction in 2014. (Compl. ¶ 8.) It also sold the church property to NAKDI in an alleged effort to avoid foreclosure. (*Id.* ¶ 8i; Abraham Faction Br. in Opposition to Preliminary Injunction at 18-21, R.R. at 613a-16a.) These corporate filings and this

---

[6] There is a dispute as to whether the Consent Order binds the parties here, as allegedly individuals involved in the current action are not identical to individuals in the prior action.

5

sale led the Chacko Faction to initiate the present action by filing its Complaint.[7] The Abraham Faction filed preliminary objections to the Complaint on the grounds the trial court lacked subject matter jurisdiction under the deference rule, the same grounds it uses to challenge the trial court's Order at issue before us.

The Abraham Faction argues the deference rule applies because the issue it appealed is strictly limited to sharing the church property so that each faction can conduct its respective services, which is in direct contravention of a directive from the Patriarch that only one Holy Eucharist is to be held on church grounds every Sunday. It also argues the Chacko Faction should not be able to argue that the deference rule does not apply. This argument is based upon the Chacko Faction successfully arguing that the trial court lacked subject matter jurisdiction in a 2014 action, which was allegedly the mirror opposite of the present litigation.[8] It also argues that a Consent Order from prior litigation, in which the parties agreed to share possession of the church property on Sundays, does not create subject matter jurisdiction. This is because subject matter jurisdiction cannot be waived or created through consent.

The Chacko Faction responds that this dispute is not doctrinal in nature and relates solely to the allegedly improper filing of corporate documents and transfer of church assets. As such, it contends that neutral principles of property and corporate

---

[7] The Complaint included the following counts – Count I: Equity; Count II: Breach of Fiduciary Duty; Count III: Violation of the Uniform Fraudulent Transfer Act of Pennsylvania, 12 Pa. C.S. §§ 5101-5110; Count IV: Civil Conspiracy; Count V: Fraud; Count VI: Constructive Fraud; Count VII: Quiet Title; and Count VIII: Declaratory Judgment. (R.R. at 33a-44a.)

[8] According to the Abraham Faction, it brought an action against the Chacko Faction in June 2014 alleging, *inter alia*, that the Chacko Faction filed fraudulent corporate documents and disrupted church services and operations. Judge McInerney of the trial court found the court lacked subject matter jurisdiction under the deference rule. (R.R. at 274a-86a.)

6

law can be applied by the Court to settle this dispute without intruding into ecclesiastical matters.

The deference rule is a principle that was first recognized by the United States Supreme Court in *Watson v. Jones*, 80 U.S. 679 (1872), in which two competing factions sued to determine which was entitled to use of the local church. Under the rule,

> whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Id.* at 727.

In *Presbytery of Beaver-Butler of the United Presbyterian Church in the United States of America v. Middlesex Presbyterian Church*, 489 A.2d 1317 (Pa. 1985), the Pennsylvania Supreme Court explained the rationale behind the deference rule as follows:

> [T]he right to practice one's belief and worship as one chooses is so deep a root of our constitutional culture that a court, even one with the best intentions, can be no more than a clumsy intruder into the most delicate and sensitive areas of human life. When Caesar enters the Temple to decide what the Temple believes, he can leave behind only his own views. The view of a court as to who are heretics among warring sects is worth nothing, and must count as nothing if our cherished diversity of religious views is to prevail.

*Id.* at 1320.

The United States Supreme Court and the Pennsylvania Supreme Court have further defined the deference rule over the years.[9] For instance, the courts have

---

[9] For a thorough discussion of the history of the deference rule, see *Connor v. Archdiocese of Philadelphia*, 975 A.2d 1084, 1090-97 (Pa. 2009).

7

reiterated that civil courts cannot intrude into ecclesiastical matters but recognized that "there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969). In *Beaver-Butler*, the Pennsylvania Supreme Court explained that not all disputes among members of a congregation are doctrinal in nature. *Beaver-Butler*, 489 A.2d at 1320. Rather, "[s]ome are simply disputes as to [the] meaning of agreements on wills, trusts, contracts, and property ownership. These disputes are questions of civil law and are not predicated on any religious doctrine." *Id.* at 1320-21.

The fact that a matter involves property does not necessarily mean courts can always decide the matter using neutral principles of law. There are times when the ownership of church property is intertwined with church doctrine. For instance, in *Southeastern Pennsylvania Synod of the Evangelical Lutheran Church in America v. Meena*, 19 A.3d 1191 (Pa. Cmwlth. 2011), a local church and its members appealed an order that required them to deliver keys to the church building, along with all books, records, and financial documents, to the synod after the synod decided to close the church. The local church argued the case involved a property dispute that could be determined under neutral principles of law. We, however, found the controversy surrounded the synod's decision to take over the church and close its doors. We stated:

> To review Synod's decision to impose synodical administration, the trial court would have to examine the internal processes and criteria utilized by Synod and the Synod Assembly to determine the on-going viability of their congregations. We agree with the trial court that this decision concerns ecclesiastical matters regarding internal church governance and organization beyond the purview of our courts.

8

*Id.* at 1197.

Notably, in *Beaver-Butler*, where neutral principles were found to apply, the Pennsylvania Supreme Court emphasized that the dispute was "not based on a doctrinal schism" and "[n]either party [there was] arguing that they [were] the true church in an ecclesiastical sense." 489 A.2d at 1323; *see also Jones v. Wolf*, 443 U.S. 595, 604 (1979) (Whenever "the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.").

Based upon the above, it is clear that civil courts **may** have jurisdiction over disputes involving church property. The Chacko Faction argues this is such a case because it is simply seeking a determination of ownership based upon deeds and corporate documents. The Chacko Faction also argues the trial court had the authority to enforce prior court orders, including the 2014 Consent Order, in which the parties agreed to share possession of the property on Sundays for the purpose of worship services. However, the Abraham Faction stresses that the only issue it appealed was whether the trial court overstepped its bounds when it entered an order establishing a worship schedule, which, in its view, is purely ecclesiastical.

Here, the underlying dispute is related to ownership of the church property. While the determination of ownership may inextricably be tied to which faction is the "true church," that issue was not yet before the trial court at the time it issued its October 5, 2016 Order. It is important to remember the procedural posture of this case. This matter presently before us relates to a preliminary injunction. "The purpose of a preliminary injunction is to preserve the status quo and prevent imminent and irreparable harm that may occur before the merits of the case can be heard and resolved." *Nether Providence Twp. v. Coletta*, 133 A.3d 86, 91 (Pa.

9

Cmwlth. 2016).  Our review of an order granting a preliminary injunction is limited to whether the trial court committed an abuse of discretion.  *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1000 (Pa. 2003).

> [W]e do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below.  Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the [trial court].

*Id.* (quoting *Roberts v. Bd. of Dirs. of Sch. Dist.*, 341 A.2d 475, 478 (Pa. 1975)).

In order to be entitled to a preliminary injunction, a party must show:  (1) "an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages"; (2) "that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings"; (3) an injunction "will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct"; (4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest," i.e., "that it is likely to prevail on the merits"; (5) the injunction "is reasonably suited to abate the offending activity"; and (6) the injunction "will not adversely affect the public interest."  *Id.* at 1001 (citations omitted).

In its Rule 1925(a) Opinion, the trial court found each of the elements were satisfied.  The injunction, it said, was granted "only to the extent that [the] Order would permit both parties to use the property for worship and other religious observances and would prohibit either party from transferring, encumbering, and/or receiving any financial gain from the property, during the pendency of the litigation." (Trial Ct. Op. at 5.)  Moreover, the trial court found the Order "was the

10

only means of preventing the immediate and irreparable harm to any party of not being able to access the property for worship and that greater injury would result by not imposing the terms and schedule to allow shared use of the property." (*Id.*) In addition, the trial court found that the Order does not adversely affect the public's interest and simply restored all parties to the status of using the property. (*Id.* at 5-6.) Finally, the trial court found "there was a likelihood of success on the merits to the extent that the [trial court's] secular review of the right to possession would permit such a determination." (*Id.* at 6.)

The record reveals "apparently reasonable grounds" for the trial court's conclusions. *Summit Towne Centre*, 828 A.2d at 1000. There was testimony that the two factions previously shared access to the church until suddenly the Chacko Faction was locked out. There was also testimony that the name on the church itself was altered. Thus, the Order only returned the parties to the status quo, that is, sharing possession of the church property as they did for more than two years preceding this action.[10] In addition, the Order was intended to only be effective until the trial court could address the merits of the parties' arguments and was narrowly tailored to achieve this goal.[11] The trial court found the Chacko Faction would suffer immediate and irreparable harm by being denied access, which could not be adequately compensated by damages and that greater injury would result by refusing the injunction.

Under these circumstances, until the full merits are addressed, it was within the trial court's discretion to issue the Order requiring the parties to continue to share

---

[10] Unlike the 2014 Consent Order that expressly provided shared possession of the premises for purposes of worship, the Order on appeal does not mention worship.

[11] As the trial court correctly points out in its Opinion, its Order did not address the corporate documents filed, proposed rental payments, and future sale of the church property. (Trial Ct. Op. at 7.)

possession of the church property as they had been doing until the Abraham Faction locked out the Chacko Faction. *See Atterberry v. Smith*, 522 A.2d 683, 686-688 (Pa. Cmwlth. 1987) (finding the issue of who the recognized local pastor was and what powers the pastor possessed required deference, but the trial court was still within its equitable powers to enjoin one faction from disrupting or harassing other church members). We find no error in the trial court "imposing an interim set of terms and schedule permitting the parties to make use of the property pending the litigation." (Trial Ct. Op. at 1.)

In its second issue, the Abraham Faction argues the trial court erred because it was not given the opportunity to present its case before issuance of the preliminary injunction. However, this is not entirely accurate. The trial court did issue the Order, but it appears as though the intent was to issue an interim order to maintain the status quo while the matter was taken under advisement. Importantly, at the hearing and prior to issuing the Order, the trial court explained it would accept additional documentary evidence, affidavits, or depositions. "[T]here is no absolute right to a hearing on a preliminary injunction; it is a matter of discretion for the trial court." *Nether Providence*, 133 A.3d at 91. Instead of presenting evidence to support its position, the Abraham Faction filed the instant appeal. We cannot find that the trial court erred or abused its discretion by issuing an interim order to maintain the status quo until additional evidence could be submitted when the Abraham Faction elected not to present additional evidence.

In its last issue, the Abraham Faction maintains the trial court erred in not requiring a bond pursuant to Rule 1531(b) of the Pennsylvania Rules of Civil Procedure, Pa. R.C.P. No. 1531(b). The Chacko Faction counters that the need for

12

a bond is excused because the Order also included a finding of contempt and imposed sanctions for which no bond was required.[12]

Rule 1531(b) provides:

(b) Except when the plaintiff is the Commonwealth of Pennsylvania, a political subdivision or a department, board, commission, instrumentality or officer of the Commonwealth or of a political subdivision, a preliminary or special injunction shall be granted only if

(1) the plaintiff files a bond in an amount fixed and with security approved by the court, naming the Commonwealth as obligee, conditioned that if the injunction is dissolved because improperly granted or for failure to hold a hearing, the plaintiff shall pay to any person injured all damages sustained by reason of granting the injunction and all legally taxable costs and fees, or

(2) the plaintiff deposits with the prothonotary legal tender of the United States in an amount fixed by the court to be held by the prothonotary upon the same condition as provided for the injunction bond.

Pa. R.C.P. No. 1531(b).

As noted above, when the Order was originally issued, it was only an interim order, which the trial court considered a "stay." (R.R. at 1202a-03a.) The trial court did not actually "formally dispose" of the preliminary injunction request until February 17, 2017, when it ordered the October 5, 2016 Order to remain in effect. As a result, no bond was required as of the time of the Order under appeal. Furthermore, after the trial court advised the parties of its intent to "stay" the proceedings, counsel was asked if counsel had anything to place on the record and counsel for the Abraham Faction did not raise the issue of a bond. Therefore, the issue of a bond is not properly before us.

---

[12] The Chacko Faction cites no authority for this position.

13

For the foregoing reasons, we affirm the Order of the trial court.

_____

**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

St. Mary's Knanaya Church, Inc.,                :
Reverend Father Chacko Punnoose,                :
Reji Philip, Jake Puthiamadathil,               :
Kuriakose M. Abraham, Renny                     :
Eranackal, Tony Alummootil, and                 :
Cherian Mathew                                  :
                                                :
                    v.                          :       No. 1782 C. D. 2016
                                                :
Father E.M. Unnikunju Abraham,                  :
Joby Joseph, Stephen Mathew, John               :
Mathew, Thampi Pothen, Kutty                    :
Kurien, Kenny Pothen, Tobin                     :
Thomas, Abraham Cherian, and                    :
North American Knanaya                          :
Diocese, Inc.,                                  :
                    Appellants                  :

## O R D E R

NOW, November 16, 2017, the Order of the Court of Common Pleas of Philadelphia County, dated October 5, 2016, is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge